IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MANHATTAN CONSTRUCTION COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-376C |
| v. | ) | (Judge Robert H. Hodges, Jr.) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF FACT, PROPOSED UNDISPUTED FACTS, AND PROPOSED CONCLUSIONS OF LAW

Proposed Undisputed Facts: General

1. The Department of Agriculture, acting through the Agricultural Research Service ("ARS"), awarded a contract to Manhattan Construction Company ("MCC") on May 31, 2001, for the construction of the Beltsville Human Nutrition Center ("project"), Contract No. 50-3K15-1-0900 ("contract"). JE001.

2. The initial value of the contract was $20,716,000. JE001.

3. ARS utilized the services of Jacobs Engineering as the architectural and engineering firm ("A & E") to provide the specifications and the drawings for the project. JE004, JE005.

4. MCC awarded a subcontract to Caigeann Mechanical Company ("Caigeann") on or about September 20, 2001, in the amount $6,117,000.[1] Complaint ("Compl."), ¶ 6.

5. MCC alleges in its March 16, 2005 complaint that ARS ordered MCC to perform the following work that was not within the scope of the contract: the installation of steam traps at low and at high pressure steam risers, the installation of AHU stacked coil piping, and the

[1] The claim at issue in this matter is a pass-through claim brought by MCC upon behalf of Caigeann.

installation of heat maintenance cable.[2] Compl. ¶ 8, ¶ 9-23.

6. MCC seeks judgment in the amount of $63,955, pre-judgement interest, post-judgment interest, reasonable costs, attorneys fees, and other relief. Compl. Wherefore clause.

Proposed Undisputed Facts: Steam Traps At High And Low Pressure Risers

7. Steam traps are fist-sized devices that remove liquid from steam piping. Testimony of Kenneth McLauchlan ("KM"), Sandy Morgan ("SM"), Frank King ("FK"); Brisco Hamlin ("BH"), and Yuri Berman ("YB").

8. The project includes a steam piping system in which steam is generated in a boiler at a plant. Testimony of KM, SM, FK, BH, YB.

9. The steam enters the project's buildings as steam (in vapor form) and is distributed by a system of pipes throughout the buildings. Testimony of KM, SM, FK, BH, YB.

10. The steam heats the water used to provide ambient heat and hot water for the buildings. Testimony of KM, SM, FK, BH, YB.

11. Liquid must be kept out of the steam piping for the system to operate as effectively as possible. Testimony of KM, SM, FK, BH, YB.

12. As the steam heats the air, or the water used for domestic hot water, for the buildings, some steam cools and condenses into liquid form. Testimony of KM, SM, FK, BH, YB.

13. This liquid collects at low places in the piping system, such as the bottom of risers, which are pipes that go up. Testimony of KM, SM, FK, BH, YB.

14. Steam traps at the bottom of risers remove the liquid that collects there. Testimony of

[2] MCC has abandoned its claim set forth in paragraphs 24 - 26 of its complaint, pertaining to the kitchen cooler and freezer condensate lines.

KM, SM, FK, BH, YB.

15. The liquid returns to the steam plant via condensate lines. Testimony of KM, SM, FK, BH, YB.

16. Drip legs are used to collect condensed steam vapor at locations when the steam pipes change from horizontal to vertical directions. Testimony of KM, SM, FK, BH, YB.

17. When a horizontal pipe must turn to become vertical, if one did not have any special considerations, one could simply use a ninety-degree turn. Testimony of KM, SM, FK, BH, YB.

18. With steam, one has the special consideration of removing condensed steam. Testimony of KM, SM, FK, BH, YB.

19. A pipe that is in the shape of the letter "T" on its side may be used to make a horizontal pipe vertical. Testimony of KM, SM, FK, BH, YB.

20. One side of the top bar of the "T" goes upward and continues to transport steam; the other side goes down to a dead end. Testimony of KM, SM, FK, BH, YB.

21. The bottom part of the "T" is the drip leg and is there to collect liquid. Testimony of KM, SM, FK, BH, YB.

22. The accumulation of condensate in a high pressure steam riser is potentially damaging to downstream pipe and fittings. Testimony of KM, SM, FK, BH, YB.

23. "Condensate hammering" is a process in which liquid condensate is entrained in a stream of high velocity steam. Testimony of KM, SM, FK, BH, YB.

24. When this liquid encounters a change in direction, the kinetic energy is converted into impulse, which can cause the catastrophic failure of valves and fittings. Testimony of KM, SM, FK, BH, YB.

25. MCC and Caigeann knew, or should have known, that steam risers must be installed with traps at the base of the risers, to remove any accumulated condensate and prevent condensate hammering. Testimony of KM, SM, FK, BH, YB.

26. The locations of all contractually required steam traps were not identified in the contract drawings. Testimony of KM, SM, FK, BH, YB.

27. With respect to steam traps, the contract provides as follows: "Install drip legs at low points and natural drainage points such as . . . bottoms of risers. . . . . Install steam traps close to drip legs." JE002, Contract Specifications section 15182, part 3.6.L.4.

28. The contract also provides that "[a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, specifications shall govern." JE012, Contract, Section H, part 15, "Specifications and Drawings for Construction" (FAR 52.236-21) (Feb 1997), Alternate I (Apr 1984), para. (a).

29. On November 22, 2002, MCC requested $11,915.00 to provide steam traps at low pressure risers. JE033.

Proposed Undisputed Facts: Steam Trap At The High Pressure Riser

30. By letter dated October 30, 2002, MCC submitted request for information ("RFI") No. 307, requesting a determination as to whether a steam trap was required at the base of the high pressure steam riser to the second floor autoclave. JE020.

31. In its October 30, 2002 response to RFI No. 307, Jacobs stated that a steam trap was required at that location, citing Specification Section 15182, Par 3.6L. JE020.

32. Jacobs directed that the condensate from the trap be connected to a low pressure steam

riser in accordance with detail B3 on Sheet M703. JE020.

33. By letter dated June 30, 2003, Caigeann advised MCC that the steam trap had been installed as directed the base of the high pressure steam riser to the second floor autoclave. but that because the steam trap was not shown on either Plan Drawing M301 or on the HVAC Steam and Condensate Piping Plan on Drawing M401, Caigeann considered the work associated with the installation of the steam trap to be a change to the contract. JE028.

34. On December 9, 2002, MCC submitted a Change Order Request seeking $4,757.00 as compensation for providing a steam trap at the high pressure steam riser. JE025.

35. On November 4, 2003, MCC requested a Contracting Officer's Final Decision ("COFD") regarding its request for compensation for installing a steam trap at the high pressure riser. JE037.

36. On March 17, 2004, the contracting officer issued a final decision denying MCC"s claim in its entirety. JE038.

37. In its March 16, 2005 complaint, MCC alleged that the steam trap at the high pressure riser was not within the scope of the contract. Compl. ¶ 8, ¶ 9-23.

<u>Proposed Findings Of Fact: Steam Trap At High Pressure Risers</u>

38. MCC and its subcontractors knew, or should have known, that the accumulation of condensate in a high pressure steam riser is potentially damaging to downstream pipe and fittings. Testimony of KM, SM, FK, BH, YB.

39. Specification Section 15182 Par. 3.5 indicates that the design intent is to provide thermodynamic traps at the base of risers on high pressure steam systems. JE002, Testimony of KM, SM, FK, BH, YB.

40. Phase 2 Drawings M301 and M401 are diagrammatic in nature, and do not show, and were not intended to show, or required to show, every fitting or device called for in the Specifications. JE005; Testimony of KM, SM, FK, BH, YB.

41. Detail B3 on Drawing M703 provides construction details for flashing high pressure condensate into low pressure steam piping. JE005; Testimony of KM, SM, FK, BH, YB.

42. The use of traps at the base of high pressure steam risers is an industry standard. Testimony of KM, SM, FK, BH, YB.

43. A reasonable estimator doing a take-off based upon the solicitation would have known a steam trap was required at the high pressure steam riser. Testimony of KM, SM, FK, BH, YB.

<u>Proposed Undisputed Facts: Steam Traps At Low Pressure Risers</u>

44. On July 22, 2002, MCC submitted RFI No. 255 requesting a determination as to whether steam traps were required at the base of the low pressure steam risers in Phase 1 and 2. JE031.

45. In a letter dated July 26, 2002, MCC directed Caigeann to install steam traps at the base of low pressure steam risers. JE031.

46. In a letter dated November 20, 2002, to MCC, Caigeann indicated that it considered that work to be outside of the original contract. JE032.

46. In a letter dated December 12, 2002, ARS directed MCC to proceed with installing steam traps at low pressure risers, and informed MCC that the steam traps were part of the original contract, and informed MCC that Specification Section 15182 Par. 3.6.L.4 required drip legs and steam traps at low points and natural drainage points, including the bottom of risers. JE034.

47. In a letter dated June 30, 2003, Caigeann advised MCC that it had installed the steam traps as directed, but that because the steam traps were not shown on either Plan Drawing M301

or on the HVAC Steam and Condensate Piping Plan on Drawing M401, the work associated with the installation of the traps constituted a change to the contract. JE036.

48. MCC submitted a Change Order Request in the amount of $11,915.00 for this work. JE033.

49. On November 4, 2003, MCC requested a Contracting Officer's Final Decision regard in response to its request for compensation for installing steam traps at the low pressure risers. JE037.

50. On March 17, 2004, the contracting officer issued a final decision denying MCC"s claim in its entirety. JE038.

51. In its March 16, 2005 complaint, MCC alleged that the steam traps for low high pressure risers were not within the scope of the contract. Compl. ¶ 8, ¶ 9-23.

<u>Proposed Findings Of Fact: Steam Traps At Low Pressure Risers</u>

52. MCC knew, or should have known, that steam risers must be installed with traps at the base of the riser to remove any accumulated condensate and to prevent condensate hammering. Testimony of KM, SM, FK, BH, YB.

53. MCC knew, or should have known, that the accumulation of condensate in a low pressure steam riser is potentially damaging to downstream pipe and fittings. Testimony of KM, SM, FK, BH, YB.

54. Specification Section 15182 Par. 3.4 indicates that the design intent is to provide float and thermostatic traps at the base of risers. JE002; Testimony of KM, SM, FK, BH, YB.

55. Detail D1 on Drawing M703, Phases 1 and 2, provides construction details for installation of traps at the base of low pressure steam risers. JE004, JE005; Testimony of KM,

SM, FK, BH, YB. .

56. The contract specifications require the installation of drip legs at low points and natural drainage points in the steam piping system, including at the bottom of risers. JE002; Testimony of KM, SM, FK, BH, YB.

57. The contract requires steam traps close to drip legs. JE002; Testimony of KM, SM, FK, BH, YB.

58. The contract requires steam traps at all risers. JE002; Testimony of KM, SM, FK, BH, YB.

Proposed Findings Of Undisputed Facts: AHU Stacked Coil Piping

59. The contract required that MCC install Air Handling Units ("AHU"). JE003.

60. AHUs function by hot steam or chilled water passing through a coil which then heats or cools the surrounding air; a fan blows the hot or cooled air into the building for heating or cooling purposes. Testimony of KM, SM, FK, BH, YB.

61. An AHU can contain either a single coil or two coils stacked on top of one another. Testimony of KM, SM, FK, BH, YB.

62. For AHUs taller than 48.5 inches, stacked coils are used. Testimony of KM, SM, FK, BH, YB.

63. For AHUs shorter than 48.5 inches, single or stacked coil may be used. Testimony of KM, SM, FK, BH, YB.

64. Stacked coil AHUs are generally less expensive units than single coil AHUs. Testimony of KM, SM, FK, BH, YB.

65. Stacked coil AHUs are more commonly used than single coil AHUs. Testimony of KM,

SM, FK, BH, YB.

66. Each coil in either a single or a stacked coil AHU unit requires supply and return piping. Testimony of KM, SM, FK, BH, YB.

67. Stacked coil AHUs require more piping than single coil AHUs. Testimony of KM, SM, FK, BH, YB.

68. The contract provides that coil sections are to be "common or individual." Contract Specifications, section 15854, part 2.6.A. JE003.

69. The contract provides that "[u]nits with stacked coils shall have an intermediate drain pan or drain through to collect condensation from top coil." Contract Specifications, section 15854, part 2.3.D.4. JE003.

70. The contract provides that "[t]he Drawings indicate the general arrangement of piping, fittings, and specialties." Connections Contract Specifications, section 15854, part 3.4. JE003.

71. The drawings include a diagram of an AHU with piping for supply, return, drainage, and air vent. Contract Drawings, Phases 1 and 2, M702. JE004, JE005.

72. The diagram is based upon a single coil unit, and shows only one of each of the kinds of piping connections. JE004, JE005.

73. Contract drawing M802 specified York AHUs that are manufactured with stacked coils for coil heights over 48.25 inches. JE004, JE005.

74. The other manufactures listed in specification section 15854 2.1.A also manufacture AHUs with stacked coils for coil heights over 48.25 inches. JE003.

75. The contract provides that "[a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like

effect as if shown or mentioned in both. In case of difference between drawings and specifications, specifications shall govern." Contract, Section H, part 15 "Specifications and Drawings for Construction" (FAR 52.236-21) (Feb 1997), Alternate I (Apr 1984), para. (a). JE012.

76. On June 5, 2002, MCC submitted RFI No. 242 (Caigeann RFI No. 122), requesting information on the installation of coil piping for the AHUs. JE040.

77. In a letter dated December 12, 2002, ARS directed MCC to proceed with the installation of stacked coil piping as required by the contract. JE044.

78. The ARS indicated that the Air Handling Unit Schedule on drawing M802 specified York AHUs that are manufactured with stacked coils for coil heights over 48.25 inches, and also indicated that the other AHU manufacturers listed in Specification Section 15854 Par. 2.1.A use coil stacking method for large coils. JE040.

79. The ARS also noted that Specification Section 15854 Par. 3.4.A states that the drawings only indicate general arrangement of piping fittings and specialties, and all associated piping necessary to install the AHUs was part of the contract. JE040.

80. In a letter to MCC dated June 30, 2003, Caigeann maintained that the contact did not have any coil height standard or requirement; that there was no indication that there was a requirement for more than one coil in an AHU; and that Caigeann was unaware that stacked coils would be required until they received the approved submittals. JE046.

81. In its June 30, 2003 letter, Caigeann also indicated that the Coil Piping Details A5 and B5 on drawing M702 indicated a single coil, and not a stacked coil, and when Caigeann initiated an RFI for a piping detail, they were provided with a drawing which detailed the additional piping

required for the second coil. JE046.

82. In its June 30, 2003 letter, Caigeann also indicated that single coils meeting the contract requirements were available at an additional charge of approximately $500 per coil; and that the additional work needed to install the second coil was beyond what was necessary to comply with the contract. JE046.

83. On November 11, 2002, MCC submitted a Change Order Request in the amount of $23,138 for this work. JE042.

84. By letter dated December 12, 2002, the ARS directed MCC to install AHUs using stacked coil piping in order to meet the performance requirements of the contract. JE044.

85. On March 17, 2004, the contracting officer issued a final decision denying MCC"s claim in its entirety. JE048.

86. In its March 16, 2005 complaint, MCC alleges that the contract required the installation of only single coil AHUs and that the requirement to install the more expensive stacked coil AHUs constituted work outside of the scope of the contract. Compl. ¶ 13, ¶ 14.

<u>Proposed Findings Of Fact: AHU Stacked Coil Piping</u>

87. MCC and Caigeann knew, or should have known, that Coil Piping Details A5 and B5 on drawing M702 were intended to show the general arrangement of piping and fittings provided at each coil. Testimony of KM, SM, FK, BH, YB.

88. MCC and Caigeann knew, or should have known that manufacturers supply stacked coil units or single coil units depending upon the size of the AHU, and the need to maintain proper face velocity through the coils. Testimony of KM, SM, FK, BH, YB.

89. The language in specification Section 15854 Par. 2.3.D.4, referencing "…units with

stacked coils…," referencing the specific requirements for condensate pans, and specification section 15854, part 2.6.A, providing that coil sections are to be "common or individual," meaning that the coils may be stacked or single, were sufficient to inform a reasonable contractor to consider in submitting its bid which of the AHUs would be furnished with stacked coils, so that the cost of all piping, valves, fittings, and labor associated with installation of the AHUs was included in the bid. JE003; Testimony of KM, SM, FK, BH, YB.

90. MCC and Caigeann were aware, or should have been aware that York, the AHU supplier, was capable of supplying AHUs with either multiple stacked coils or individual coils. Testimony of KM, SM, FK, BH, YB.

91. Under the terms of the contract, MCC was required to determine whether single coil or stacked coil AHUs were necessary to meet the performance requirements of the contract. JE003.

92. MCC had the option to base its bid upon single coils at AHU-1 and 2 in Phase 1, and AHU-1 and 3 in Phase 2, or stacked coils. JE004, JE005; Testimony of KM, SM, FK, BH, YB.

93. The contract requires that MCC furnish any AHU-related piping. JE003; Testimony of KM, SM, FK, BH, YB.

94. The AHU schedules found in the drawings, which describe the characteristics of the required AHUs, are based on both single and stacked coil AHU models. JE004, JE005; Testimony of KM, SM, FK, BH, YB.

95. Models 1 and 2 in the Phase 1 Drawings AHU Schedule are stacked coil models. Contract Drawings, Phase 1, M802. JE004; Testimony of KM, SM, FK, BH, YB.

96. Models 1 and 3 in the Phase 2 Drawings AHU Schedule are stacked coil models. Contract Drawings, Phase 2, M802. JE005; Testimony of KM, SM, FK, BH, YB.

97. The contract requires that MCC furnish AHU-related piping for stacked coil AHUs where stacked coil AHUs are used. JE003; Testimony of KM, SM, FK, BH, YB.

98. Because the contract provides that the drawings indicate only the general arrangement of piping, and both the specifications and the drawings contemplate use of stacked coil AHUs, the diagram serves to exemplify the piping connections required for AHUs, rather than to dictate that single coil AHUs be used. JE003; Testimony of KM, SM, FK, BH, YB.

99. The drawing diagram cannot be interpreted to require use of single coil AHUs where the specifications indicate that stacked coil piping may be used. JE004, JE005; Testimony of KM, SM, FK, BH, YB.

100. If the drawings diagram is interpreted as requiring single coil AHUs, then a difference would exist with the specifications, which allow for use of stacked coil piping, Contract Specifications, section 15854, parts 2.6.A, 2.3.D.4. Therefore, the specifications would govern and use of stacked coils would fall within the scope of the contract. JE003.

101. The drawing diagram is simply an example of the general piping requirements for AHUs, regardless of whether they are single or stacked coil AHUs. JE004, JE005; Testimony of KM, SM, FK, BH, YB.

102. The drawing diagram does not constitute a requirement for use of single coil AHUs. JE004, JE005; Testimony of KM, SM, FK, BH, YB.

<u>Proposed Findings Of Uncontroverted Facts: Heat Maintenance Cable</u>

103. Heat maintenance cable is used to maintain the water temperature in hot water pipes. Testimony of KM, SM, FK, BH, YB.

104. The contract provides that MCC "[f]urnish and install a UL listed system of electric self-

regulating heating cable and components for maintaining the water temperature in the hot water lines as indicated on the drawings." Contract Specifications, section 15140, part 2.5.A. JE001.

105. The contract further provides that "the cable shall be designed, manufactured, and UL listed for domestic hot water temperature maintenance." Id. JE001.

106. The contract provides that "[t]he [heat maintenance] system shall be installed according to the drawings and the manufacturer's instructions. The installer shall be responsible for providing a functional system, installed in accordance with national and local code requirements." Contract Specifications, section 15140, part 3.7.A. JE001.

107. The contract provides that "[a]ll plumbing work on this project shall be installed in accordance with the specifications, the IPC plumbing codes, and all applicable city codes." Contract Drawings, Phase 2, P001. JE005.

108. The International Plumbing Code requires that a domestic hot water supply system be provided with a method of maintaining the temperature of the water. International Plumbing Code §§ 607.1, 607.2 (2000). JE013.

109. The applicable codes require the installation of heat maintenance cable for domestic hot water piping. JE013.

110. The drawings indicate locations for "junction box[es] for hot water temperature maintenance cable." JE004, JE005.

111. The drawings also note that requirements should be verified with the specifications. Contract Drawings, Phase 1, E400, keyed note 20; Contract Drawings, Phase 2, E400, keyed note 18. JE004, JE005.

112. In a letter dated September 10, 2002, MCC directed Caigeann to install the heat

maintenance cable. JE056.

113. In a letter dated September 13, 2002 to MCC, Caigeann indicated that it would install "Temperature Maintenance Heat Tracing on Domestic Hot Water," as directed by MCC. JE057.

114. In its September 6, 2002 letter, Caigeann indicated that it did not consider the work to be required under the contract. JE054.

115. In its September 13, 2002 letter, Caigeann opined that Specification Section 15140 Par. 2.5.A, Section 15140 Par. 2.5.D, and Section 15140 3.7.D required furnishing and installing Temperature Maintenance Heat Tracing as indicated on the drawings, but that there was no note or other indication on the drawings that identified where the tracing cable was required. JE057.

116. Heat maintenance cable and heat tracing cable serve different functions. Testimony of KM, SM, FK, BH, YB.

117. Heat maintenance cable maintains the temperature of the hot water as it is transported through the hot water pipes. Testimony of KM, SM, FK, BH, YB.

118. Heat tracing cable is used to locate hot water pipes. Testimony of KM, SM, FK, BH, YB.

119. The requirement for heat maintenance cables is covered by Section15140, titled "Domestic Water Piping."

120. The requirement for heat trace cable, that is, self-regulating , electric heating cables suitable for freeze protection of metal or plastic piping, is covered by Section 15775, titled "Electric Heating Cables."

121. In its September 13, 2002 letter, Caigeann noted that while the relevant Plumbing Code contained a specification for a Temperature Maintenance system, in the opinion of Caigeann the analysis required for such a system constituted a design function, and was, therefore, not the

responsibility of the contractor installing the system. JE057.

122. In its letter dated September 9, 2002, to MCC, ARS stated that contract specification section 15140, Par. 2.5, required that the contractor furnish and install a UL listed system of electric self-regulating heating cable and components for maintaining the water temperature in hot water lines as indicated on the drawings. JE055.

123. In its September 9, 2002 letter, ARS instructed MCC to install heat maintenance cable in accordance with contract specifications. JE055.

124. On November 11, 2002, MCC requested $17, 195 as compensation for installing heat maintenance cable. Compl. ¶ 11.[3]

125. On March 17, 2004, the contracting officer issued a final decision denying MCC's claim in its entirety. JE057.

126. In its March 16, 2005 complaint, MCC alleges that the installation of the heat maintenance cable was outside the scope of the contract. Compl. ¶ 8, ¶ 9-23.

Proposed Findings Of Fact: Heat Maintenance Cable

127. Any reasonable estimator should have understood that Specification Section 15140 Par. 2.5.A, Section 15140 Par. 2.5.D, and Section 15140 3.7 required the contractor to furnish and install temperature maintenance cable as indicated on the drawings. JE001; Testimony of KM, SM, FK, BH, YB.

128. Specification Section 15140, covering the requirements for the Domestic Hot Water System, includes Specification Section 15140 Par. 2.5.A, that calls for the system to be installed

[3] In ¶ 9 of the Complaint, it states $17,195 as the requested amount by MCC for compensation. The letter on November 11, 2002, however, requests $23, 608.

" … for maintaining the water temperature in the hot water lines indicated on the drawings…" JE001.

129. Based on this language, a reasonable contractor would have based its bid on the cost of installing a temperature maintenance system that complied with the technical requirements in the Specification wherever domestic hot water lines are shown on the drawings. JE001; Testimony of KM, SM, FK, BH, YB.

130. Specification Section 15140, Par 2.5 and Par. 3.7 constitutes a performance specification. JE001.

131. The contract requires cable for maintaining the water temperature in hot water lines. JE001.

DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

Pursuant to the Court's September 29, 2006 scheduling order and Appendix A, ¶14, of the Rules of the Court of Federal Claims, defendant hereby submits is Proposed Conclusions of Law.

1. Issues involving contract interpretation present questions of law to be decided by this Court. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997-98 (Fed. Cir.1996).

2. The language of the contract must be given its plain meaning, and the contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts. Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed .Cir.2003) (en banc).

3. "An interpretation giving rise to reasonable meaning to all parts of a contract will be endorsed over one that leaves portions of the contract meaningless." Gresham, Smith & Partners v. United States, 24 Cl. Ct. 796, 802 (1991); see also Nielsen-Dillingham Builders, J.V. v. United

States, 43 Fed. Cl. 5, 11 (1999) ("[P]ermitting [the contractor's interpretation] to govern would render considerable portions of the [contract] useless, meaningless, or otherwise surplusage. The court is precluded from entertaining such an interpretation.").

4. A specific contract provision will control over a general contract provision. See Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1369 (Fed. Cir .2005) ("Our precedent establishes as a principle of contract interpretation") (citing Hol-Gar Mfg. v. United States, 351 F.2d 972, 980 (Ct. Cl.1965).

5. The Federal Acquisition Regulation ("FAR") 52.236-21(a) provides that in case of difference between drawings and specifications, the specifications govern.

6. The Changes clause in provides that in the case of defective specifications for which the government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

7. In order to recover for damage attributable to defective Government specifications, the contractor must prove: (1) that the specifications were defective; (2) that it complied with applicable specifications; and (3) that the damage was directly attributable to the defective specification. Fox Construction v. General Services Administration, GSBCA No. 11543, 93-3 BCA & 26,193, citing Santa Fe Engineers, Inc., ASBCA No. 27933, et al., 85-2 BCA & 18,001

8. A contractor's claims must be proven by a preponderance of the evidence, and must demonstrate liability, causation, and injury. Sagebrush Consultants, L.L.C., IBCA 4182E-2000, 2000 IBCA LEXIS 11 (October 26, 2000), citing Wilner Construction Co. v. United States, 24 F.3d 1397, 1401 (Fed Cir. 1994).

9. A plaintiff must prove that damages allegedly resulting from the Government's breach of

a contract "was attributable solely to, and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 456 F.2d 1315, 1330 (1972). See also Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) ("[T]he plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. . . . For damages to be direct there must be no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably.")

10. The FAR defines claim as a contracting party's written assertion, "seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." FAR § 2.101. A claim also must request a contracting officer's final decision ("COFD"). See, e.g., Scan-Tech Sec., L.P.v. United States, 46 Fed. C1. 326, 331 (2000).

11. The letters from Manhattan Construction Company ("MCC") in which MCC sought payment of a specific amount of money as compensation for changed or added work, and requested COFDs, constituted claims.

12. The contracting officer's March 17, 2004 letter, written in response to MCC's letters demanding additional compensation, titled "Contracting Officer's Final Decision", in which she denied that MCC was entitled to additional compensation constituted COFDs.

13. A contracting officer's response which conclusively states the Government's position on entitlement need not include boilerplate language. Scan-Tech Sec. v. United States, 46 Fed. C1. 326, 334 (2000); see also Kevin J. Lema'g v. Gen. Servs. Admin., 03-2 BCA ¶ 32,345, 2000 WL 21949186 (GSBCA).

14. The March 17, 2004 COFD is valid despite the omission of boilerplate language regarding the contractor's appeal rights.

15. As long as the basic requirement of conclusively stating the Government's position regarding entitlement is met, a contracting officer's response to a claim qualifies as a COFD. Cf. Scan-Tech Sec. v. United States, 46 Fed. C1. 326, 334 (2000) ("The fact that the contractor may express a desire to settle or negotiate the dispute or meet with the Government will not necessarily prevent a finding that the contractor's submissions requested a final decision.").

16. MCC treated the March 17, 2004 COFD as such by timely filing a complaint in the Court of Federal Claims seeking damages for the same items for which the COFD had denied it additional compensation.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, D.C. 20530
202-307-0252
202-307-0972 (Fax)

November 16, 2006

Attorneys for Defendant