IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MANHATTAN CONSTRUCTION COMPANY, | * | |
| Plaintiff, | * | |
| v. | * | Case No.: 05-376C<br>(Judge Robert H. Hodges) |
| THE UNITED STATES, | * | |
| Defendant. | * | |

* * * * * * * * * * * * *

**MANHATTAN CONSTRUCTION COMPANY'S**
**REVISED MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Plaintiff, Manhattan Construction Company ("MCC"), by its undersigned counsel, pursuant to RCFC Appendix "A" Paragraph 14 and this Honorable Court's September 29, 2006 Order, submits the following Memorandum of Contentions of Fact and Law[1], and states as follows:

## I. Introduction

This case arises out of the construction of the Beltsville Human Nutrition Research Center (the "Project") under USDA contract no.: 50-3K15-1-0900 (the "Prime Contract") between MCC and The United States by and through the USDA (the "USDA" or "Government").

On or about May 31, 2001, MCC entered into the Prime Contract with the USDA for the construction of the Project, which involved the construction of a new laboratory research facility at the USDA's Beltsville, Maryland campus. The initial value of the Prime Contract, before changes, additions and deletions, totaled Twenty Million Seven Hundred Sixteen Thousand Dollars and No Cents ($20,716,000.00). The Prime Contract includes the changes clause contained at FAR § 52.243-4 and supplemented by Prime Contract Article G.5. In anticipation of the performance of the Prime Contract, on or about September 20, 2001, MCC entered into a subcontract agreement

---

1 By agreement of counsel and because the relevant exhibits are agreed upon and will be used by both MCC and the Government, MCC and the Government will be separately filing a joint exhibit list.

(the "Subcontract") with Caigeann Mechanical Company, Inc. ("CMCI"), the real party in interest herein, whereby CMCI agreed to perform the mechanical and related work on the Project, as was set forth in the Subcontract, at the agreed upon Subcontract price of Six Million One Hundred Seventeen Thousand Dollars and No Cents ($6,117,000.00).

During the course of performance of its work on the Project, the USDA ordered MCC and CMCI to perform certain additional work on the Project for which MCC and CMCI are entitled to be compensated. The USDA contends that the additional work was within the scope of the Prime Contract, and as such, refused to compensate MCC for the additional work rendered. Accordingly, MCC filed the above-captioned action to recover the additional costs incurred relating to the following changes:

- Domestic Water Heat Trace ($17,195.00)
- AHU Stacked Coil Piping ($23,138.00)
- Low Pressure Steam Traps ($11,915.00)
- High Pressure Steam Trap ($4,757.00)
- Kitchen Cooler And Freezer Condensate Lines ($6,950.00)[2]

## II. Facts MCC Expects To Prove At Trial

MCC expects to prove the following facts at the trial in this case:

1. MCC and the USDA entered into the Prime Contract.

2. The initial value of the Prime Contract, before changes, additions and deletions, totaled Twenty Million Seven Hundred Sixteen Thousand Dollars and No Cents ($20,716,000.00).

3. The Prime Contract includes the changes clause contained at FAR § 52.243-4 and supplemented by Prime Contract Article G.5.

[2] MCC has determined that this change is not within the purview or responsibility of the USDA. Accordingly, MCC has communicated to the Government that it will be abandoning its claim for additional compensation relating to this change, and no discussion of this change will be included herein or at trial.

4. MCC and CMCI entered into the Subcontract whereby CMCI agreed to perform the mechanical and related work on the Project, as was set forth in the Subcontract, at the agreed upon Subcontract price of Six Million One Hundred Seventeen Thousand Dollars and No Cents ($6,117,000.00).

Domestic Water Heat Trace

5. The USDA directed MCC to install heat tracing cable on the domestic hot water pipes on the Project.

6. The Prime Contract specifications indicate that heat tracing cable is to be installed as indicated on the Prime Contract drawings.

7. The Prime Contract drawings do not show that heat tracing cable is to be installed on the domestic hot water pipes on the Project.

8. The Prime Contract does not require that heat tracing cable is to be installed on the domestic hot water pipes on the Project.

9. MCC timely notified the USDA that it considered the direction to install heat tracing cable on the domestic hot water lines on the Project to be a change to the Prime Contract scope of work.

10. MCC timely notified the USDA that it would incur additional costs as a result of the direction to install heat tracing cable on the domestic hot water lines on the Project.

11. MCC incurred additional costs relating to the direction to install heat tracing cable on the domestic hot water lines on the Project in the amount of $17,195.00.

12. The USDA issued a purported[3] contracting officer's final decision rejecting MCC's claim for additional costs relating to the direction to install heat tracing cable on the domestic hot water lines on the Project.

[3] As will be discussed in Part III below, the purported contracting officer's final decisions issued with respect to each of the claims asserted by MCC failed to comply with the provisions of 48 C.F.R. § 33.211.

AHU Stacked Coil Piping

13. The USDA directed MCC to provide stacked coils in AHUs "1" and "2" in Project Phase 1 and AHUs "1" and "3" in Project Phase 2.

14. The Prime Contract specifications indicate that the AHUs to be installed by MCC on the Project could be installed with either single coils or stacked coils.

15. The Prime Contract drawings indicate the piping arrangement for the installation of single coil AHUs.

16. The Prime Contract drawings did not indicate the piping arrangement for the installation of stacked coil AHUs.

17. MCC planned on providing AHUs with single coils.

18. The USDA, through the submission process, directed MCC to provide stacked coils in AHUs "1" and "2" in Project Phase 1 and AHUs "1" and "3" in Project Phase 2.

19. As a result, MCC submitted an RFI seeking clarification as to how the USDA desired the piping for the stacked coil AHUs to be installed as there are numerous ways in which the piping could have been installed.

20. The USDA directed MCC to install the stacked coil piping in the manner in which it chose, and issued a revised drawing depicting the stacked coil piping arrangement it desired for the stacked coil AHUs.

21. MCC timely notified the USDA that it would incur additional costs as a result of the direction to install the piping at the stacked coils in AHUs "1" and "2" in Project Phase 1 and AHUs "1" and "3" in Project Phase 2 in the manner chosen by the USDA.

22. MCC incurred additional costs relating to the direction to install the piping at the stacked coils in AHUs "1" and "2" in Project Phase 1 and AHUs "1" and "3" in Project Phase 2, in the manner chosen by the USDA, in the amount of $23,138.00.

23. The USDA issued a purported contracting officer's final decision rejecting MCC's claim for additional costs relating to the direction to install the piping at the stacked coils in AHUs "1" and "2" in Project Phase 1 and AHUs "1" and "3" in Project Phase 2 in the manner chosen by the USDA.

Low Pressure Steam Traps

24. The USDA directed MCC to install steam traps at certain low pressure steam risers on the Project.

25. The Prime Contract specifications indicate that steam traps are to be installed "at low points and natural drainage points such as ends of mains, bottoms of risers, and ahead of pressure regulators, control valves, isolation valves, pipe bends, and expansion joints."

26. The Prime Contract drawings show where steam traps are to be installed on the Project.

27. The Prime Contract drawings contain a schedule showing the steam traps that are to be installed on the Project.

28. The Prime Contract drawings do not show steam traps at the base of the low pressure risers on the Project.

29. The steam trap schedule does not show steam traps being installed at the base of the low pressure risers on the Project.

30. The steam system installed on the Project is an engineered system which was designed and engineered specifically for the Project.

31. Casual changes to the steam system would effect the operation, integrity and/or effectiveness of the Project steam system.

32. The steam system as designed and depicted on the Prime Contract drawings would have operated as intended.

33. MCC timely notified the USDA that it considered the direction to install steam traps at the base of the low pressure steam risers on the Project to be a change to the Prime Contract scope of work.

34. MCC timely notified the USDA that it would incur additional costs as a result of the direction to install steam traps at the base of the low pressure steam risers on the Project.

35. MCC incurred additional costs relating to the direction to install steam traps at the base of the low pressure steam risers on the Project in the amount of $11,915.00.

36. The USDA issued a purported contracting officer's final decision rejecting MCC's claim for additional costs relating to the direction to install steam traps at the base of the low pressure steam risers on the Project.

High Pressure Steam Trap

37. The USDA directed MCC to install a steam trap at the base of the high pressure steam riser to the second floor autoclave.

38. The Prime Contract specifications indicate that steam traps are to be installed "at low points and natural drainage points such as ends of mains, bottoms of risers, and ahead of pressure regulators, control valves, isolation valves, pipe bends, and expansion joints."

39. The Prime Contract drawings show where steam traps are to be installed on the Project.

40. The Prime Contract drawings contain a schedule showing the steam traps that are to be installed on the Project.

41. The Prime Contract drawings do not show a steam trap being installed at the base of the high pressure steam riser to the second floor autoclave.

42. The steam trap schedule does not show a steam trap being installed at the base of the high pressure steam riser to the second floor autoclave.

43. The steam system installed on the Project is an engineered system which was designed and engineered specifically for the Project.

44. Casual changes to the steam system would effect the operation, integrity and/or effectiveness of the Project steam system.

45. The steam system as designed and depicted on the Prime Contract drawings would have operated as intended.

46. MCC timely notified the USDA that it considered the direction to install a steam trap at the base of the high pressure steam riser to the second floor autoclave to be a change to the Prime Contract scope of work.

47. MCC timely notified the USDA that it would incur additional costs as a result of the direction to install a steam trap at the base of the high pressure steam riser to the second floor autoclave.

48. MCC incurred additional costs relating to the direction to install a steam trap at the base of the high pressure steam riser to the second floor autoclave in the amount of $4,757.00.

49. The USDA issued a purported contracting officer's final decision rejecting MCC's claim for additional costs relating to the direction to install a steam trap at the base of the high pressure steam riser to the second floor autoclave.

## III. Issues Of Fact And Law To Be Resolved By The Court

The issues of fact and law to be resolved by the Court boil down to the interpretation of the Prime Contract drawings and specifications with respect to whether MCC was required, under the Prime Contract, to provide to the USDA the work set forth above, or whether the additional work which MCC provided, and which is the subject of this litigation, was not included in the Prime Contract, and that, pursuant to FAR § 52.243-4, Prime Contract Article G.5, and the well established case law, MCC is entitled to be compensated for the additional work as a result.

The USDA has taken the position that the additional work for which MCC is seeking compensation was included in the Prime Contract scope of work. In support of this position, the USDA has produced an expert report wherein the USDA's expert, Mr. Kenneth R. McLauchlan, opined that the additional work for which MCC is seeking compensation, was included in the Prime Contract and that no compensation is owed to MCC for providing the additional work to the USDA. MCC has taken the position, supported by its own expert, Mr. Kevin Tracy, that the additional work for which MCC is seeking compensation was not included in the Prime Contract, and that MCC is accordingly entitled to compensation for providing the additional work to the USDA. Thus, the Court will have to resolve whether the additional work for which MCC is seeking compensation was or was not included in the Prime Contract scope of work.

In addition, the Court will be required to decide whether the USDA's expert is qualified to provide an expert opinion as to the interpretation of the Prime Contract. Mr. McLauchlan was not involved with the design or construction of the Project. As of the date of his deposition, he had not even visited the Project. His report was solely based upon documents provided to him by the Government—he had no unfettered access to the Project documents. He was not provided with certain documents (namely submittals and shop drawings) which are crucial to the final analysis as to whether the additional work for which MCC is seeking compensation was extra or not. He became involved with MCC's claims only after this litigation was initiated. Yet, his expert report is based upon his interpretation[4] of the Prime Contract specifications and the Prime Contract drawings—all of which are part of the Prime Contract. It is well settled that courts, and not experts, determine legal questions of contract interpretations based upon the rules of contract interpretation and construction. *See*, *Conner Bros. Const. Co., Inc. v. U.S.*, 65 Fed.Cl. 657, 667 (2005) (noting that the "[i]nterpretation of a contract, including a contract's specifications and drawings, is a matter to be

[4] At his deposition, Mr. McLauchlan stated on numerous occasions and in various ways that his report is based upon his interpretation of the Prime Contract drawings and specifications.

resolved by the court."); *Kneiper v. U.S.*, 38 Fed.Cl. 128, 136 (1997) (same); *Kidder Peabody & Co., Inc. v. IAG International Acceptance Group N.V.*, 14 F.Supp.2d 391, 404 (S.D.N.Y. 1998) (excluding the testimony of law professor/expert seeking to testify, in an abuse of process/malicious prosecution case, that a party asserting breach of contract claims (which formed the basis for the allegations of abuse of process/malicious prosecution) had probable cause to believe that its contract was breached, because the professor/expert would inevitably have to discuss his construction of the contract and the parties' obligations thereunder, which testimony would usurp the role of the fact-finder); *Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 301-02 (6th Cir. 1998) (holding that experts may not testify as to the legal effect of a contract and that, because the interpretation of a contract is an issue of law, expert testimony regarding issues of law is improper (citations omitted)); *Villafane Elec. Corp. v. Reliance Ins. Co.*, 2004 WL 385041 (S.D.N.Y. 2004) (construction expert not permitted to testify about legal conclusions or meaning of contractual provisions) (unpublished opinion attached hereto). This is especially true in this case where it is undisputed that Mr. McLauchlan is not competent to draw legal conclusions.[5] Thus, the propriety of Mr. McLauchlan's opinions and conclusions is called into question and the Court will need to resolve whether, and to what extent, Mr. McLauchlan would be allowed to provide expert testimony and opinions in this case.

## IV. Applicable Legal Principles

In addition to the legal principles discussed in Part III, above, which are incorporated herein by reference as if fully restated herein, the following additional legal principles apply in this case.

1. FAR § 52.243-4, provides that the Government is required to compensate MCC for changes to the Prime Contract scope of work, as follows:

CHANGES (AUG 1987)

(a) The Contracting Officer may, at any time, without notice to the sureties,

[5] During Mr. McLauchlan's deposition, counsel for the Government objected, on at least two occasions, to questions posed by counsel for MCC on the ground that Mr. McLauchlan is not competent to draw legal conclusions.

if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes—

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

(3) In the Government-furnished facilities, equipment, materials, services, or site; or

(4) Directing acceleration in the performance of the work.

(b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; Provided, that the Contractor gives the Contracting Officer written notice stating—

(1) The date, circumstances, and source of the order; and

(2) That the Contractor regards the order as a change order.

(c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

(e) The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of the proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) of this clause.

(f) No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

The provisions of FAR § 52.243-4 are included in the Prime Contract and supplemented by the provisions of Prime Contract Article G.5, which provides as follows:

**G.5 Supplement To Changes Clause**

The provisions of the Changes Clause (FAR 52 .243-4), as applicable, are supplemented as follows:

(a) The contractor shall provide an itemized breakdown or take—off for all charges involving an increase or decrease in the contract price. The proposal shall be in sufficient detail that will enable the Government to determine the reasonableness of the contractor's and subcontractor's cost to do the change As a minimum, the following shall he shown:

1. Material quantities and unit prices;
2. Labor costs (brokendown by trades, hours worked, and hourly rate);
3. Labor burden (Fringe Benefits, Workmen's Compensation, and Public Liability Insurance);
4. Overhead;
5. Profit;
6. FICA, and FUTA employment taxes; and
7. Sales tax (if any).

(b) On proposals offering a credit for work omitted, deductions for overhead and profit shall also be shown.

(c) If the proposed change will result in an increase or decrease in the contract performance period, the contractor shall state the exact number of days involved. If the proposed change is approved and the Government agrees with the increase or decrease in completion time, the completion date will become a part of the contract modification.

(d) Following (G.6) is a sample format for showing related costs as a result of a change order. A similar sheet shall accompany each written detailed cost breakdown. The sample format is self—explanatory and clearly shows the method for computing overhead, profit, and other items on proposed changes.

Thus, because the additional work for which MCC is seeking compensation herein is a change to the Prime Contract scope of work, the Government, in accordance with FAR § 52.243-4 and Prime Contract Article G.5 is required to compensate MCC for the additional cost of said changed work.

2. FAR § 33.211 sets forth the items which must be included in the contracting officer's decision with respect to a claimed change, and establishes the procedure to be followed by the contractor in the event that the contracting officer fails to issue a decision in accordance with the provisions of FAR § 33.211, as follows:

**33.211 Contracting officer's decision.**

(a) When a claim by or against a contractor cannot be satisfied or settled by mutual agreement and a decision on the claim is necessary, the contracting officer shall—

(1) Review the facts pertinent to the claim;
(2) Secure assistance from legal and other advisors;
(3) Coordinate with the contract administration office or contracting office, as appropriate; and
(4) Prepare a written decision that shall include a—

(i) Description of the claim or dispute;

(ii) Reference to the pertinent contract terms;

(iii) Statement of the factual areas of agreement and disagreement;

(iv) Statement of the contracting officer's decision, with supporting rationale;

(v) Paragraph substantially as follows:

> This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision; and

(vi) Demand for payment prepared in accordance with 32.610(b) in all cases where the decision results in a finding that the contractor is indebted to the Government.

(b) The contracting officer shall furnish a copy of the decision to the contractor by certified mail, return receipt requested, or by any other method that provides evidence of receipt. This requirement shall apply to decisions on claims initiated by or against the contractor.

(c) The contracting officer shall issue the decision within the following statutory time limitations:

(1) For claims of $100,000 or less, 60 days after receiving a written request from the contractor that a decision be rendered within that period, or within a reasonable time after receipt of the claim if the contractor does not make such a request.

(2) For claims over $100,000, 60 days after receiving a certified claim; provided, however, that if a decision will not be issued within 60 days, the contracting officer shall notify the contractor, within that period, of the time within which a decision will be issued.

(d) The contracting officer shall issue a decision within a reasonable time, taking into account—

(1) The size and complexity of the claim;

(2) The adequacy of the contractor's supporting data; and

(3) Any other relevant factors.

(e) The contracting officer shall have no obligation to render a final decision on any claim exceeding $100,000 which contains a defective certification, if within 60 days after receipt of the claim, the contracting officer notifies the contractor, in

> writing, of the reasons why any attempted certification was found to be defective.
>
> (f) In the event of undue delay by the contracting officer in rendering a decision on a claim, the contractor may request the tribunal concerned to direct the contracting officer to issue a decision in a specified time period determined by the tribunal.
>
> (g) Any failure of the contracting officer to issue a decision within the required time periods will be deemed a decision by the contracting officer denying the claim and will authorize the contractor to file an appeal or suit on the claim.
>
> (h) The amount determined payable under the decision, less any portion already paid, should be paid, if otherwise proper, without awaiting contractor action concerning appeal. Such payment shall be without prejudice to the rights of either party.

The decisions issued by the contracting officer relating to the additional work for which MCC is seeking compensation herein failed to comply with the provisions of FAR § 33.211. Specifically, the decisions do not contain a statement of the factual areas of agreement and disagreement in accordance with FAR § 33.211(a)(4)(iii), or a statement, in accordance with FAR § 33.211(a)(4)(v), advising MCC that the purported decision is the contracting officer's final decision and that MCC may appeal the decision to the agency board of contract appeals or to this Court. Accordingly, pursuant to FAR § 33.211(f), MCC has interpreted the contracting officer's failure to provide a final decision in accordance with FAR § 33.211 as a deemed denial of MCC's claims, and has accordingly commenced the within action in this Court.

3. It is well established that, when the Government modifies a contract, the contractor is entitled to recover damages pursuant to an equitable adjustment. The Court of Federal Claims, in *International Data Products Corp. v. The United States*, 70 Fed.Cl. 387 (2006), explained this principle, and distinguished it from damages which are awarded in the absence of a contract clause allowing for them, as follows:

> Equitable adjustments are corrective measures utilized to keep a contractor whole when the Government modifies a contract. *Bruce Constr. Corp. v. United States*, 163 Ct.Cl. 97, 100, 324 F.2d 516, 518 (1963); *see also*, *North American Constr. Corp. v. United States*, 56 Fed.Cl. 73, 78-79 (2003) ("the spirit and purpose of an equitable adjustment is to benefit the contractor and make it whole for changes ordered by the government."). Essentially, they are fair price adjustments under a contract clause

> for changed work. *See*, *e.g.* 48 C.F.R. § 52.243-4 (2005); *see also*, Ralph C. Nash, Jr., Steven L. Schooner & Karen R. O'[B]rien, *the Government Contracts Reference Book* 215 (2nd Ed.1998). Thus, equitable adjustments are distinguished from damages, which are awarded in the absence of a contract clause calling for an equitable adjustment. *See e.g. SAB Constr., Inc. v. United States*, 66 Fed.Cl. 77, 84 (2005) ("The plaintiff seeks these costs either as an equitable adjustment pursuant to a contract clause, or as damages for breach of contract."); *see also* 8 Nash & Cibinic Report ¶ 1, *Pricing Defective Specification Claims: Does the Theory Matter?* (Jan.1994).

*Id.* at 402.

In the instant case, the Government modified the Prime Contract by requiring MCC to perform work which was outside of the scope of the Prime Contract. Accordingly, pursuant to FAR § 52.243-4 and Prime Contract Article G.5, MCC is entitled to an equitable adjustment to compensate it for the additional costs it incurred as a result of the Government's modification of the Prime Contract.

**<u>V. Witnesses</u>**

MCC plans on calling the following individuals as witnesses at the trial herein:

1. Donna Fleming, Caigeann Mechanical Co., Inc., P. O. Box 274, Clarksville, Maryland 21029. Mrs. Fleming is the president of CMCI and is expected to testify with respect to the Project and the additional work claims asserted by MCC herein.

2. Kevin Tracy, Caigeann Mechanical Co., Inc., P. O. Box 274, Clarksville, Maryland 21029. Mr. Tracey provided an expert report and opinion for MCC in this case and is expected to testify with respect to the Project and his expert opinions.

3. Jimmy Dale Menefee, Jr., 272 Hemmingway Lane, Severna Park, Maryland 21146. Mr. Menefee was the steamfitter foreman for CMCI and is expected to testify with respect to the issues relating to the Project, specifically, the steam piping and the AHUs.

4. Michael Parkinson, MCC, 8550 Arlington Boulevard, Suite 204, Fairfax, Virginia 22031. Mr. Parkinson was an assistant project manager for MCC and is expected to testify with respect to the Project and the additional work claims asserted by MCC herein.

Dated: January 22, 2007

Respectfully submitted,

s/ Eli Robbins
ELI ROBBINS

HARRISON LAW GROUP
40 W. Chesapeake Ave., Suite 600
Towson, Maryland 21204
Telephone No.: (410) 832-0000
Facsimile No.: (410) 832-9929

Counsel for Plaintiff,
MANHATTAN CONSTRUCTION COMPANY