IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MANHATTAN CONSTRUCTION COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 05-376C<br>(Judge Robert H. Hodges, Jr.) |

JOINT STIPULATION OF FACTS

General

1. The Department of Agriculture, acting through the Agricultural Research Service ("ARS"), awarded a contract to Manhattan Construction Company ("MCC") on May 31, 2001, for the construction of the Beltsville Human Nutrition Center ("project"), Contract No. 50-3K15-1-0900 ("contract"). JE001.

2. The initial value of the contract was $20,716,000. JE001.

3. ARS utilized the services of Jacobs Engineering as the architectural and engineering firm ("A & E") to provide the specifications and the drawings for the project. JE005, JE006.

4. MCC awarded a subcontract to Caigeann Mechanical Company ("Caigeann") on or about September 20, 2001, in the amount $6,117,000.[1] Complaint ("Compl."), ¶ 6.

5. MCC alleges in its March 16, 2005 complaint that ARS ordered MCC to perform the following work that was not within the scope of the contract: the installation of steam traps at low and at high pressure steam risers, the installation of AHU stacked coil piping, and the

---

[1] The claim at issue in this matter is a pass-through claim brought by MCC upon behalf of Caigeann.

installation of heat maintenance cable.[2] Compl. ¶ 8, ¶ 9-23.

6. MCC seeks judgment in the amount of $57,005.00, pre-judgement interest, post-judgment interest, reasonable costs, attorneys fees, and other relief. Compl. Wherefore clause.

Steam Traps At High And Low Pressure Risers

7. Steam traps are fist-sized devices that remove liquid from steam piping.

8. The project includes a steam piping system in which steam is generated in a boiler at a plant.

9. The steam enters the project's buildings as steam (in vapor form) and is distributed by a system of pipes throughout the buildings.

10. The steam heats the water used to provide ambient heat and hot water for the buildings.

11. Liquid must be kept out of the steam piping for the system to operate as effectively as possible.

12. As the steam heats the air, or the water used for domestic hot water, for the buildings, some steam cools and condenses into liquid form.

13. This liquid collects at low places in the piping system, such as the bottom of risers, which are pipes that go up.

14. Steam traps at the bottom of risers remove the liquid that collects there.

15. The liquid returns to the steam plant via condensate lines.

16. Drip legs are used to collect condensed steam vapor at locations where the steam pipes change from horizontal to vertical directions.

---

[2] MCC has abandoned its claim set forth in paragraphs 24 - 26 of its complaint, pertaining to the kitchen cooler and freezer condensate lines.

17. When a horizontal pipe must turn to become vertical, if one did not have any special considerations, one could simply use a ninety-degree turn.

18. With steam, one has the special consideration of removing condensed steam.

19. A pipe that is in the shape of the letter "T" on its side may be used to make a horizontal pipe vertical.

20. One side of the top bar of the "T" goes upward and continues to transport steam; the other side goes down to a dead end.

21. The bottom part of the "T" is the drip leg and is there to collect liquid.

22. The accumulation of condensate in a high pressure steam riser is potentially damaging to downstream pipe and fittings.

23. "Condensate hammering" is a process in which liquid condensate is entrained in a stream of high velocity steam.

24. When this liquid encounters a change in direction, the kinetic energy is converted into impulse, which can cause the catastrophic failure of valves and fittings.

25. The locations of all steam traps were not identified in the contract drawings.

26. With respect to steam traps, the contract provides as follows: "Install drip legs at low points and natural drainage points such as . . . bottoms of risers. . . . . Install steam traps close to drip legs." JE002, Contract Specifications section 15182, part 3.6.L.4.

27. The contract also provides that "[a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, specifications shall govern." Contract, Section H, part 15, "Specifications and

Drawings for Construction" (FAR 52.236-21) (Feb 1997), Alternate I (Apr 1984), para. (a). JE013.

28. On November 22, 2002, MCC requested $11,915.00 to provide steam traps at low pressure risers. JE034.

Steam Trap At The High Pressure Riser

29. By letter dated October 30, 2002, MCC submitted request for information ("RFI") No. 307, requesting a determination as to whether a steam trap was required at the base of the high pressure steam riser to the second floor autoclave. JE021.

30. In its October 30, 2002 response to RFI No. 307, Jacobs stated that a steam trap was required at that location, citing Specification Section 15182, Par 3.6L. JE021.

31. Jacobs directed that the condensate from the trap be connected to a low pressure steam riser in accordance with detail B3 on Sheet M703. JE021.

32. By letter dated June 30, 2003, Caigeann advised MCC that the steam trap had been installed as directed the base of the high pressure steam riser to the second floor autoclave, but that because the steam trap was not shown on either Plan Drawing M301 or on the HVAC Steam and Condensate Piping Plan on Drawing M401, Caigeann considered the work associated with the installation of the steam trap to be a change to the contract. JE029.

33. On December 9, 2002, MCC submitted a Change Order Request seeking $4,757.00 as compensation for providing a steam trap at the high pressure steam riser. JE026.

34. On November 4, 2003, MCC requested a Contracting Officer's Final Decision ("COFD") regarding its request for compensation for installing a steam trap at the high pressure riser. JE038.

35. On March 17, 2004, the contracting officer issued a final decision denying MCC"s claim in its entirety. JE039.

36. In its March 16, 2005 complaint, MCC alleged that the steam trap at the high pressure riser was not within the scope of the contract. Compl. ¶ 8, ¶ 9-23.

37. Detail B3 on Drawing M703 provides construction details for flashing high pressure condensate into low pressure steam piping. JE005, JE006.

Steam Traps At Low Pressure Risers

38. On July 22, 2002, MCC submitted RFI No. 255 requesting a determination as to whether steam traps were required at the base of the low pressure steam risers in Phase 1 and 2. JE032.

39. In a letter dated July 26, 2002, MCC directed Caigeann to install steam traps at the base of low pressure steam risers. JE032.

40. In a letter dated November 20, 2002, to MCC, Caigeann indicated that it considered that work to be outside of the original contract. JE033.

41. In a letter dated December 12, 2002, ARS directed MCC to proceed with installing steam traps at low pressure risers, and informed MCC that the steam traps were part of the original contract, and informed MCC that Specification Section 15182 Par. 3.6.L.4 required drip legs and steam traps at low points and natural drainage points, including the bottom of risers. JE035.

42. In a letter dated June 30, 2003, Caigeann advised MCC that it had installed the steam traps as directed, but that because the steam traps were not shown on either Plan Drawing M301 or on the HVAC Steam and Condensate Piping Plan on Drawing M401, the work associated with the installation of the traps constituted a change to the contract. JE037.

43. MCC submitted a Change Order Request in the amount of $11,915.00 for this work.

JE034.

44. On November 4, 2003, MCC requested a Contracting Officer's Final Decision regard in response to its request for compensation for installing steam traps at the low pressure risers. JE038.

45. On March 17, 2004, the contracting officer issued a final decision denying MCC"s claim in its entirety. JE039.

46. In its March 16, 2005 complaint, MCC alleged that the steam traps for low high pressure risers were not within the scope of the contract. Compl. ¶ 8, ¶ 9-23.

47. Detail D1 on Drawing M703, Phases 1 and 2, provides construction details for installation of traps at the base of low pressure steam risers. JE005, JE006.

<u>AHU Stacked Coil Piping</u>

48. The contract required that MCC install Air Handling Units ("AHU"). JE003.

49. AHUs function by hot steam or chilled water passing through a coil which then heats or cools the surrounding air; a fan blows the hot or cooled air into the building for heating or cooling purposes.

50. An AHU can contain either a single coil or two coils stacked on top of one another.

51. For AHUs taller than 48.5 inches, stacked coils may be used.

52. For AHUs shorter than 48.5 inches, single or stacked coil may be used.

53. Stacked coil AHUs are generally less expensive units than single coil AHUs.

54. Each coil in either a single or a stacked coil AHU unit requires supply and return piping.

55. Stacked coil AHUs require more piping than single coil AHUs.

56. The contract provides that coil sections are to be "common or individual." Contract

Specifications, section 15854, part 2.6.A. JE003.

57. The contract provides that "[u]nits with stacked coils shall have an intermediate drain pan or drain through to collect condensation from top coil." Contract Specifications, section 15854, part 2.3.D.4. JE003.

58. The contract provides that "[t]he Drawings indicate the general arrangement of piping, fittings, and specialties." Connections Contract Specifications, section 15854, part 3.4. JE003.

59. The drawings include a diagram of an AHU with piping for supply, return, drainage, and air vent. Contract Drawings, Phases 1 and 2, M702. JE005, JE006.

60. The diagram is based upon a single coil unit, and shows only one of each of the kinds of piping connections. JE005, JE006.

61. The other manufactures listed in specification section 15854 2.1.A also manufacture AHUs with stacked coils for coil heights over 48.25 inches. JE003.

62. The contract provides that "[a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, specifications shall govern." Contract, Section H, part 15 "Specifications and Drawings for Construction" (FAR 52.236-21) (Feb 1997), Alternate I (Apr 1984), para. (a). JE013.

63. On June 5, 2002, MCC submitted RFI No. 242 (Caigeann RFI No. 122), requesting information on the installation of stacked coil piping for the AHUs. JE041.

64. In a letter dated December 12, 2002, ARS directed MCC to proceed with the installation of stacked coil piping as required by the contract. JE045.

65. The ARS indicated that the Air Handling Unit Schedule on drawing M802 specified York AHUs that are manufactured with stacked coils for coil heights over 48.25 inches, and also indicated that the other AHU manufacturers listed in Specification Section 15854 Par. 2.1.A use coil stacking method for large coils. JE041.

66. The ARS also noted that Specification Section 15854 Par. 3.4.A states that the drawings only indicate general arrangement of piping fittings and specialties, and all associated piping necessary to install the AHUs was part of the contract. JE041.

67. In a letter to MCC dated June 30, 2003, Caigeann maintained that the contract did not have any coil height standard or requirement; that there was no indication that there was a requirement for more than one coil in an AHU; and that Caigeann was unaware that stacked coils would be required until they received the approved submittals. JE047.

68. In its June 30, 2003 letter, Caigeann also indicated that the Coil Piping Details A5 and B5 on drawing M702 indicated a single coil, and not a stacked coil, and when Caigeann initiated an RFI for a piping detail, they were provided with a drawing which detailed the additional piping required for the second coil. JE047. See also JE041.

69. In its June 30, 2003 letter, Caigeann also indicated that single coils meeting the contract requirements were available at an additional charge of approximately $500 per coil; and that the additional work needed to install the second coil was beyond what was necessary to comply with the contract. JE047.

70. On November 11, 2002, MCC submitted a Change Order Request in the amount of $23,138 for this work. JE043.

71. By letter dated December 12, 2002, the ARS directed MCC to install AHUs using stacked

coil piping in order to meet the performance requirements of the contract. JE045.

72. On March 17, 2004, the contracting officer issued a final decision denying MCC's claim in its entirety. JE049.

73. In its March 16, 2005 complaint, MCC alleges that the contract required the installation of only single coil AHUs and that the requirement to install the more expensive stacked coil AHUs constituted work outside of the scope of the contract. Compl. ¶ 13, ¶ 14.

74. The contract requires that MCC furnish all AHU-related piping. JE003.

75. Models 1 and 2 in the Phase 1 Drawings AHU Schedule are stacked coil models. Contract Drawings, Phase 1, M802. JE005.

76. Models 1 and 3 in the Phase 2 Drawings AHU Schedule are stacked coil models. Contract Drawings, Phase 2, M802. JE006.

77. The contract requires that MCC furnish AHU-related piping for stacked coil AHUs where stacked coil AHUs are used. JE003.

Heat Maintenance Cable

78. Heat maintenance cable is used to maintain the water temperature in hot water pipes.

79. The contract provides that MCC "[f]urnish and install a UL listed system of electric self-regulating heating cable and components for maintaining the water temperature in the hot water lines as indicated on the drawings." Contract Specifications, section 15140, part 2.5.A. JE004.

80. The contract further provides that "the cable shall be designed, manufactured, and UL listed for domestic hot water temperature maintenance." Id. JE004.

81. The contract provides that "[t]he [heat maintenance] system shall be installed according to the drawings and the manufacturer's instructions. The installer shall be responsible for

providing a functional system, installed in accordance with national and local code requirements." Contract Specifications, section 15140, part 3.7.A. JE004.

82. The contract provides that "[a]ll plumbing work on this project shall be installed in accordance with the specifications, the IPC plumbing codes, and all applicable city codes." Contract Drawings, Phase 2, P001. JE006.

83. The International Plumbing Code requires that a domestic hot water supply system be provided with a method of maintaining the temperature of the water. International Plumbing Code §§ 608 (2000). JE014.

84. The applicable codes require the installation of heat maintenance cable for domestic hot water piping. JE014.

85. The electrical drawings indicate locations for "junction box[es] for hot water temperature maintenance cable." The plumbing drawings indicate the location for the heat trace power connection point. JE005, JE006.

86. The drawings also note that requirements should be verified with the specifications. Contract Drawings, Phase 1, E400, keyed note 20; Contract Drawings, Phase 2, E400, keyed note 18. JE005, JE006.

87. In a letter dated September 10, 2002, MCC directed Caigeann to install the heat maintenance cable. JE057.

88. In a letter dated September 13, 2002 to MCC, Caigeann indicated that it would install "Temperature Maintenance Heat Tracing on Domestic Hot Water," as directed by MCC. JE058.

89. In its September 6, 2002 letter, Caigeann indicated that it did not consider the work to be required under the contract. JE055.

90. In its September 13, 2002 letter, Caigeann opined that Specification Section 15140 Par. 2.5.A, Section 15140 Par. 2.5.D, and Section 15140 3.7.D required furnishing and installing Temperature Maintenance Heat Tracing as indicated on the drawings, but that there was no note or other indication on the drawings that identified where the tracing cable was required. JE058.

91. Heat maintenance cable and heat tracing cable serve different functions.

92. Heat maintenance cable maintains the temperature of the hot water as it is transported through the hot water pipes.

93. Heat tracing cable is used to prevent exposed pipes from freezing.

94. The requirement for heat maintenance cables is covered by Section15140, titled "Domestic Water Piping." JE004.

95. The requirement for heat trace cable, that is, self-regulating, electric heating cables suitable for freeze protection of metal or plastic piping, is covered by Section 15775, titled "Electric Heating Cables." JE008.

96. In its September 13, 2002 letter, Caigeann noted that while the relevant Plumbing Code contained a specification for a Temperature Maintenance system, in the opinion of Caigeann the analysis required for such a system constituted a design function, and was, therefore, not the responsibility of the contractor installing the system. JE058.

97. In its letter dated September 9, 2002, to MCC, ARS stated that contract specification section 15140, Par. 2.5, required that the contractor furnish and install a UL listed system of electric self-regulating heating cable and components for maintaining the water temperature in hot water lines as indicated on the drawings. JE056.

98. In its September 9, 2002 letter, ARS instructed MCC to install heat maintenance cable in

accordance with contract specifications. JE056.

99. On November 11, 2002, MCC requested $17, 195 as compensation for installing heat maintenance cable. Compl. ¶ 11.[3]

100. On March 17, 2004, the contracting officer issued a final decision denying MCC's claim in its entirety. JE064.

101. In its March 16, 2005 complaint, MCC alleges that the installation of the heat maintenance cable was outside the scope of the contract. Compl. ¶ 8, ¶ 9-23.

102. Specification Section 15140, covering the requirements for the Domestic Hot Water System, includes Specification Section 15140 Par. 2.5.A, that calls for the system to be installed " … for maintaining the water temperature in the hot water lines **as** indicated on the drawings…" JE004.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

---

[3] In ¶ 9 of the Complaint, MCC seeks $17,195 in compensation. The November 11, 2002, request, however, sought compensation in the amount of $23, 608. The difference is due to the fact that the agency provided compensation to MCC because the agency changed the thickness of the insulation.

s/ Eli Robbins
ELI ROBBINS, ESQ.
Adam C. Harrison, P.C.
40 West Chesapeake Avenue
Suite 600
Towson, Maryland 21204
(410) 832-0000
(410) 832-9929 (Fax)

Attorneys for Plaintiff

Dated: January 23, 2007

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, D.C. 20530
202-307-0252
202-307-0972 (Fax)

Attorneys for Defendant

Dated: January 23, 2007